# In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 09-1113, 09-1114, 09-1115 & 09-1116

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

DAVID NEIGHBORS, LAFREDERICK TAYLOR,
KAMAL SIMS, AND TREVOR PERRY,

*Defendants-Appellants.*

Appeals from the United States District Court
for the Southern District of Indiana, Evansville Division.
No. 3:08-cr-13-RLY/WGH—**Richard L. Young,** *Chief Judge.*

ARGUED SEPTEMBER 23, 2009—DECIDED DECEMBER 29, 2009

Before FLAUM, WOOD, and SYKES, *Circuit Judges.*

FLAUM, *Circuit Judge.* In 2008, a grand jury indicted
David Neighbors, LaFrederick Taylor, Kamal Sims and
Trevor Perry for participating in a conspiracy to distribute
crack cocaine and powder cocaine. After an eight-day
trial, a jury convicted Neighbors, Taylor, Sims and Perry
of conspiracy to possess and distribute crack cocaine,
finding each responsible for various levels of drugs

involved in the conspiracy. The jury also found Neighbors guilty of three additional drug charges and Taylor guilty of a gun charge. The jury acquitted Perry of a felon in possession of a weapon charge and acquitted one of their co-defendants completely. Neighbors, Taylor, Sims, and Perry now appeal various aspects of their consolidated trial and Perry appeals his sentence. For the reasons set forth below, we affirm on all counts.

## I. Background

A jury found that defendants-appellants Neighbors, Taylor, Sims, and Perry participated, at varying levels, in a conspiracy to possess and distribute cocaine base (crack cocaine) that spanned several months in 2007. The majority of the transactions involved in this conspiracy took place at the home of Neighbors, located at 619 Jackson Avenue in Evansville, Indiana. Law enforcement became aware of this conspiracy in April of 2007 when Detective Brock Hensley of the Vanderburgh County Task Force employed a confidential informant, Samuel Curry, to make a controlled purchase of drugs from Neighbors at 619 Jackson. Surveillance of Neighbors and individuals who frequented 619 Jackson continued after this date. Approximately a month after this controlled buy, on May 22, 2007, the Vanderburgh County Task Force obtained a wiretap for Neighbors's home phone number at 619 Jackson that ran through August 22, 2007. On July 24, 2007, the Task Force officers obtained a second wiretap for Neighbors's cell phone that also ran through August 22, 2007. During the time the Task Force was

conducting surveillance, Neighbors made at least nine trips to Louisville, Kentucky to purchase powder cocaine from his supplier, Thomas Perkins. Phone conversations amongst appellants discussing the acquisition of cocaine preceded each of these trips. Additionally, these wiretaps recorded conversations between the appellants regarding numerous other drug transactions.

On August 30, 2007, the officers executed search warrants for appellants' various residences. At the residence of Taylor, the officers found a firearm under the mattress in the bedroom and a digital scale in the living room. At the residence of Sims, officers found $918 on Sims's person and additional money in the oven. At Perry's residence, officers found digital scales in the master bedroom. At 619 Jackson, officers found a man by the name of Keshaun Horne who had money, cell phones, and scales on him. Officers also found plastic baggies, a small amount of cocaine, and two documents with Neighbors's name on them. Officers located Neighbors later that day and found him with the cell phone attached to the phone number for which they had obtained the second wiretap. Neighbors, Taylor, Sims, and Perry were taken into custody that day.

On May 21, 2008, a federal grand jury returned an eight-count indictment against Neighbors, Taylor, Sims, Perry, and eight other individuals.[1] Count One charged Neigh-

---

[1] Neighbors, Taylor, Sims, Perry and Derrick Stanfield were the only defendants who proceeded to trial. The jury acquitted

(continued...)

bors, Taylor, Sims, and Perry with conspiracy to distribute a controlled substance in violation of 21 U.S.C. § 846. The indictment specified the drug quantity and type as "50 grams, or more, of a mixture or substance containing a detectible amount of cocaine base (crack cocaine) and 5 kilograms, or more, of a mixture or substance containing a detectable amount of cocaine hydrochloride (powder cocaine)." The indictment also charged Neighbors with three other possession with intent to distribute counts, and charged each Taylor and Perry with one count of possession of a firearm by a convicted felon.

After an eight-day trial, the jury convicted all four defendants-appellants. The jury returned a verdict of guilty for all four appellants on Count One, the conspiracy count. The jury additionally returned guilty verdicts for Neighbors on the other drug counts, and Taylor on the possession of a firearm count. The jury returned a verdict of not guilty for Perry on the possession of a firearm count. On the special verdict form the jury found: (1) Neighbors engaged in a conspiracy to distribute in excess of 50 grams of cocaine base and less than 500 grams of cocaine hydrochloride; (2) Taylor engaged in a conspiracy to distribute in excess of 50 grams of cocaine base; (3) Sims engaged in a conspiracy to

---

[1] (...continued)
Stanfield. Therefore, this opinion will only address the charges surrounding Neighbors, Taylor, Sims, and Perry, the appellants in this case.

distribute in excess of 50 grams of cocaine base; and (4) Perry engaged in a conspiracy to distribute less than five grams of cocaine base. The jury did not find that Taylor, Sims, or Perry engaged in a conspiracy to distribute less that 500 grams of cocaine hydrochloride.

Defendants-appellants appeal various claimed trial and sentencing errors. We recount the facts surrounding these alleged errors in the analysis below.

## II.  Discussion

### A.  Jury Selection

The district court assembled the jury panel at random, using voter registration polls from the Evansville area. The panel of prospective jurors contained no African-Americans. During voir dire, two prospective jurors on the panel noticed and commented on the racial make-up of the jury panel. One perspective juror, of his own initiative, said, "If I were sitting in the defendant's chair, I might be a little concerned that we're all rather light skinned over here, and isn't it supposed to be a jury of your peers?" (Trial Tr. 4). Because of the jurors' comments, the district court asked the jurors whether they felt uncomfortable rendering judgments for African-Americans because they were Caucasian. All of the potential jurors responded that they did not feel uncomfortable. Despite the reassurances of the jurors, defense counsel objected to the make-up of the jury panel and moved for a mistrial. The district court denied this motion.

All four of the appellants appeal the district court's denial of the mistrial based on the racial composition of the jury pool. Appellants claim that the complete lack of African-Americans in the jury pool violated their Sixth Amendment right to a jury selected from a fair cross-section of the community. This is a mixed question of law and fact, therefore we review the issue de novo. *United States v. Phillips*, 239 F.3d 829, 842 (7th Cir. 2001).

The Supreme Court has determined that "the selection of a petit jury from a representative cross section of the community is an essential component of the Sixth Amendment right to a jury trial." *Taylor v. Louisiana*, 419 U.S. 522, 528 (1975). Both parties agree that *Duren v. Missouri*, 439 U.S. 357 (1979), controls when determining whether the jury venire is a representative cross-section of the community. Under *Duren*, "in order to establish a prima facie violation of the fair-cross-section requirement, a defendant must show: (1) the group allegedly excluded is a distinctive part of the community, (2) the representation of this group in venires from which the juries are selected is not fair and reasonable in relation to the number of such persons in the community, and (3) this underrepresentation is due to systematic exclusion of the group in the jury selection process." *Duren*, 439 U.S. at 364. The district court followed the three-part *Duren* analysis and concluded that appellants did not meet the requirements to warrant a mistrial. Specifically, the district court found that the appellants did not meet their burden of showing a systematic exclusion of African-Americans from the venire.

Appellants do not refute the district court's reasoning but rather implore this court to shift the burden of proof for the third-prong of the *Duren* analysis to the government. Appellants acknowledge that this court addressed this exact issue in *United States v. Guy*, 924 F.2d 702 (7th Cir. 1991). In *Guy*, we found that a complete lack of African-Americans on the venire satisfies the first two prongs of the *Duren* analysis to establish a violation of the fair-cross-section requirement. 924 F.2d at 706. However, we concluded that the complete lack of African-Americans on the venire alone is insufficient to satisfy the third prong of the *Duren* analysis when the venire is randomly selected from voter lists pursuant to an authorized plan. *Id.* Appellants criticize this reasoning for failing to account for systematic inequities present in a system that chooses venires from voter registration lists because voter registration lists generally under-represent minorities in the community. To address this problem, appellants propose that a district court should consider a venire wholly lacking in racial diversity prima facie evidence of systematic exclusion and require the government to rebut this presumption.

To support their argument that we should abandon *Guy*, appellants rely on *Batson v. Kentucky*, 476 U.S. 79 (1986). They argue that *Batson* stands for the proposition that issues of race are better resolved by shifting the burden of proof to the government. Applying that principle to the *Duren* analysis would force the government to show that under-representation, as determined by the district court's assessment of the first two prongs of the analysis, is not due to systematic exclusion of the group

in the jury selection process. However, no court has found the burden shifting principle from *Batson* to be appropriate in the *Duren* context. We have consistently held that the defendant bears the burden of showing that the under-representation is due to systematic exclusion. *See, e.g., Phillips*, 239 F.3d at 842. Based on this settled precedent, the district court did not err in denying appellants' motion for a mistrial because, although the venire lacked any African-Americans, appellants did not show that systematic exclusion of African-Americans caused this void.

## B. Identification of Appellants' Voices on the Wiretap Tapes

Throughout the course of the trial, the government introduced 226 phone conversations intercepted by the wiretaps on Neighbors's two phones. The government presented Detective Simpson to identify the voices of the appellants on the tapes of these phone calls. Detective Simpson identified Perry on twenty of the conversations and Sims on fourteen of the conversations. Detective Simpson also testified that Taylor was identified or mentioned in thirteen of the conversations. To lay the foundation for these identifications, Detective Simpson testified to the following facts: he recognized Neighbor's voice from a ten- to twenty-minute interview with him on the day of his arrest; he recognized Perry's voice from a five- to ten-minute interview with him on the day of his arrest and from hearing him speak in court proceedings; he recognized Sims's voice based on a ten-minute

interview after his arrest and from hearing him speak during court proceedings; and he recognized Taylor's voice from hearing him speak in court proceedings. At trial, all appellants objected to these identifications on the basis that the government had presented an insufficient foundation to support Detective Simpson's testimony regarding the identity of the speakers, that the voice identification constituted improper opinion testimony and that the government had not proven the identifications beyond a reasonable doubt. The district court overruled the objection, finding that Detective Simpson was qualified to testify to his opinion regarding the individuals speaking on the tape because he was familiar with their voices. Appellants Sims and Taylor further objected to Detective Simpson's reliance on hearing them speak in court proceedings as a basis for the voice identification as an infringement on their Fifth Amendment right against self-incrimination. The district court overruled that objection as well.

Only Taylor and Sims appeal the district court's decision to allow the voice identification testimony. They raise the same challenges on appeal that they raised to the trial court. We take these issues in turn because they require different levels of review. Whether voice identification based on in-court proceedings for a criminal defendant violates his Fifth Amendment right against self-incrimination is a question of law which we review de novo. *See United States v. Smith*, 308 F.3d 726, 740 (7th Cir. 2002). Whether the government put forth sufficient evidence to lay a proper foundation under Federal Rule of Evidence 901(b)(5) is an evidentiary question which

we review for an abuse of discretion. *United States v. Vega*, 860 F.2d 779, 789 (7th Cir. 1988).

Appellants Taylor and Sims argue that voice identification based on in-court proceedings violated their Fifth Amendment privilege against self-incrimination because the government used their compelled statements. Appellants concede that they have no protected interest in their voices and that the district court could have required them to provide voice samples to the government. *See, e.g., United States v. Dionisio*, 410 U.S. 1, 7 (1973); *Hubanks v. Frank*, 392 F.3d 926, 932 (7th Cir. 2004). Instead, Taylor and Sims argue that the government violated their Fifth Amendment rights by not going through the formal procedure of asking the district court to order voice samples from the appellants. Sims and Taylor also advance the policy argument that, in future cases involving wiretaps, criminal defendants will remain silent and risk contempt of court during routine court proceedings when asked if they understand the charges or potential penalties because speaking would mean waiving their constitutional right against self-incrimination.

Appellants' argument misstates the Fifth Amendment privilege against self-incrimination. The Fifth Amendment only prohibits the compulsion of a witness to testify against himself or otherwise provide the government with evidence of a testimonial nature. *Hubanks*, 392 F.3d at 932. The Fifth Amendment does not prohibit compulsion of speech of a non-testimonial nature, nor does it give an individual a privacy interest in the charac-

teristics of his voice. *See id.* This is why a court may compel a defendant to give a voice sample or a witness may rely on having heard the defendant speak in court to make his identification. Contrary to appellants' policy argument, a defendant would not waive his constitutional right by answering the judge's question about understanding the charges because the defendant has no right to remain silent in that situation. Allowing voice identification based on in-court proceedings does not violate an individual's Fifth Amendment right against self-incrimination. The district court properly overruled this objection.

Appellants Sims and Taylor also argue that the government failed to lay a sufficient foundation under Federal Rule of Evidence 901(b)(5) to allow Detective Simpson to identify their voices on the wiretap tapes. Federal Rule of Evidence 901(b)(5) states, "identification of a voice, whether heard firsthand or through mechanical or electronic transmissions or recording, by opinion based upon hearing the voice at any time under circumstances connecting it with the alleged speaker" comports with the authentication standard laid out in Rule 901(a).[2] We have repeatedly interpreted this rule to mean that "voice identification may occur based upon minimal familiarity." *E.g., United States v. Recendiz,*

---

[2] Federal Rule of Evidence 901(a) states, "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."

557 F.3d 511, 527 (7th Cir. 2009). We have also held that a witness's ability to hear an individual speak during a court proceeding constitutes sufficient evidence to meet the minimal familiarity requirement of Rule 901(b)(5). *United States v. Mansoori*, 304 F.3d 635, 665 (7th Cir. 2002).

Detective Simpson's foundational testimony meets this low bar of minimal familiarity. *See Recendiz*, 557 F.3d at 527; *Mansoori*, 304 F.3d at 665. To lay the foundation for his identification of Sims's voice, Detective Simpson testified that he had a five- to ten-minute conversation with Sims on the day of his arrest and he heard him speak in previous court proceedings. To lay the foundation for his identification of Taylor's voice, Detective Simpson testified that he heard Taylor speak in pervious court hearings. These pieces of testimony provided sufficient foundation for Detective Simpson's identification of appellants. Additionally, the government presented circumstantial support of the identification of Taylor. Deputy Marshal Rich Chambers testified that the officers identified Taylor's voice on a call in which Taylor and Neighbors discussed meeting at a specific location in thirty minutes. Thirty minutes later, Chambers observed Taylor meet Neighbors at that very location.

Sims and Taylor argue that Detective Simpson's testimony was inherently unreliable because a significant amount of time elapsed between when he initially listened to the tapes and when he made the voice identifications. They try to bolster their argument by pointing to the fact that the identifications occurred in preparation for trial and that the officers listened to

thousands of phone calls. While these factors may effect the weight to be given to Detective Simpson's testimony, none of these factors effect the admissibility of the evidence. Based on the minimal familiarity standard, the district court did not abuse its discretion in allowing Detective Simpson to identify Sims's and Taylor's voice on the wiretap tapes.

### C. Transcript Books of the Wiretap Tapes

When the government played recorded phone conversations to the jury, the district court allowed the jurors to follow along on government created transcripts with marginal notations of who was speaking at any given time. All of the appellants objected to the marginal notations identifying the speaker on the same grounds as their objection to Detective Simpson's testimony identifying the speakers. In response to the appellants' objection the court did not directly rule, but rather admonished the jury that the transcripts were not evidence but simply were an aid to assist in understanding the tapes. However, the district court allowed the jury to look at the transcripts, thereby implicitly overruling appellants' objection.

After closing arguments the appellants objected to the jurors taking the transcript books back to the jury room during deliberations. The district court retrieved the transcript books from the jurors and informed them that while they could not rely on the transcripts, they could listen to the tapes of the calls that had been admitted into evidence. During deliberations the jurors asked to

listen to phone calls only involving certain speakers. After a conversation between the district court and the attorneys about the best way to allow the jury to identify which conversations they wanted to hear, the district court allowed the jury to have copies of the transcript books for the sole purpose of identifying the conversations. When sending the transcript books back to the jury, the district court said,

> Members of the jury, I've discussed the matter with the attorneys. There's really no way that we can compile a list as to identify the alleged speakers in the conversations, so the only way I think we can address your request it to send the transcript book back to the jury room with you and allow you then to identify those phone calls you wish to hear. . . . Now, you may recall my instructions to you—I've said it over and over—that these transcripts are not evidence; they are only an aid to help you understand what is being said in the phone call. And the reason I'm sending the transcript book back to you is really the only way I can think of that would allow you to identify those phone calls you wish to hear.

(Trial Tr. 1107-08).

All appellants argue that the district court erred by allowing the jury to take the transcript books back to the jury room during deliberations. We review a district court's decision to allow the introduction of transcripts as an aid under an abuse of discretion standard. *United States v. Nunez*, 532 F.3d 645, 650 (7th Cir. 2008).

In *United States v. Breland*, cited by both parties, we stated, "district courts have wide discretion in deter-

mining whether to allow juries these written transcripts as aids in listening to audio tape recordings. We have previously permitted transcripts to be admitted at trial and used by the jury during deliberations when the underlying tapes are actually played during the trial." 356 F.3d 787, 794 (7th Cir. 2004). In *Breland*, the transcripts at issue included names of the speakers based on the lay testimony of a person familiar with the speakers' voices. *Id.* at 795.

Appellants attempt to distinguish *Breland* on the ground that the district court in *Breland* admitted the transcripts as evidence. In this case, the district court did not admit the transcripts as actual evidence. Rather, the district court only allowed their admission as an aid, to help the jury understand the wiretap tapes. Therefore, appellants argue, it was improper for the district court to allow the jury to consider these transcripts during deliberations. Appellants point to the actions of the district court in *United States v. Zambrana*, 841 F.2d 1320 (7th Cir. 1988), as the proper procedure for dealing with transcripts of wiretaps. In *Zambrana*, the district court allowed the jurors to use the transcripts as aids in listening to the audio tape during the trial but did not allow the transcripts to go to the jury room for the jury to consider them as substantive evidence. 841 F.2d at 1335. Additionally, the district court in *Zambrana* instructed the jury to resolve any discrepancies between the tapes and the transcripts in favor of the tapes, and to not consider the names in the margins as evidence of the identities of the speakers. *Id.*

Despite appellants' attempt at distinguishing this case, *Breland* is directly on point. In *Breland*, the district court did not admit the transcripts as evidence. Rather, just as in this case, the district court admitted the transcripts as aids. 356 F.3d at 795 ("This court has stated that district courts have wide discretion in determining whether to allow juries to use written transcripts as aids in listening to audio-tape recordings."). Additionally, in this case the district court did follow procedures very similar to those of the district court in *Zambrana*. Upon first admitting the transcripts, the district court instructed the jury that the transcripts were not evidence but were merely an aid. Then, the district court prohibited the jurors from taking the transcript books to the deliberation room. Finally, only after the district court determined that it was necessary to expedite the deliberation process did the district court allow the jury to take the transcript books to the deliberation room. Additionally, when the district court allowed the transcripts to go back to the deliberations room, the district court re-admonished the jury that the transcripts were not evidence but were only an aid to help it identify which phone calls it wanted re-played. In light of *Breland* and *Zambrana*, the district court did not abuse its discretion when it allowed the jury to take the transcript books back to the deliberation room.

**D. The Cross-examination of Kareem Davidovic**

Kareem Davidovic testified as a cooperating witness for the government. On direct examination, Davidovic

provided the following pieces of incriminating testimony: Davidovic participated in drug transactions involving cocaine powder with Neighbors on at least three occasions; Davidovic was familiar with drug transactions at 619 Jackson and the transactions would occur in the front room closet; Davidovic observed Taylor cook cocaine on the stove in a Pyrex jar; and Davidovic observed Neighbors give Sims money at various times. Davidovic also admitted that he faced a mandatory life sentence and the government agreed to recommend a more lenient sentence if he cooperated.

On cross-examination, Neighbors's attorney asked Davidovic, "Have you ever told anyone that you either have lied in this particular case or intended to lie in this particular case?" (Trial Tr. 180). Davidovic denied ever telling anyone he lied in this case or intended to lie in this case. At that time, Neighbors's attorney attempted to introduce a number of letters Davidovic admitted to writing. One of the letters stated, "I did lie on that Haitian N*****. I said he used to serve me my blow. You know I never F*** with him." The government objected on the grounds that this letter was impermissible extrinsic evidence of a specific instance of untruthfulness. Appellants advanced two arguments to the district court for why the court should admit this evidence. First, appellants argued that this letter directly contradicted Davidovic's statement that he never told anyone that he lied in this case or intended to lie in this case because the Haitian referred to Selmo Cadet, another party arrested in this case. Appellants also argued, "[I]t goes straight to the issue of his truthfulness, veracity, or lack thereof."

(Trial Tr. 187). Later in the argument regarding the admissibility of this evidence, appellants also said that the letters constitute an "admission by the witness that he is able to lie and use deceit to achieve his own goals." (Trial Tr. 189). The district court sustained the government's objection and prohibited the introduction of these letters. However, the district court acknowledged that it was willing to revisit its ruling depending on how the evidence developed.

Appellants argue that the district court erred by not allowing them to introduce the letters written by Kareem Davidovic. We review the district court's evidentiary rulings for abuse of discretion. *United States v. McGee*, 408 F.3d 966, 981 (7th Cir. 2005). If we identify an error that amounts to an abuse of discretion and a timely objection to the error was raised at trial, we must determine if the error was harmless. *Id.*

As a preliminary matter we must determine if this evidence falls within the ambit of Federal Rule of Evidence 608(b) or Federal Rule of Evidence 613. Rule 608(b) explicitly states, "[s]pecific instances of the conduct of a witness for the purpose of attacking or supporting the witness' character for truthfulness, other than the conviction of crime as provided in rule 609, may not be proved by extrinsic evidence." It is uncontested that these letters are extrinsic evidence and should be excluded if they fall solely within Rule 608(b). However, if Rule 613 governs the admission of these letters, this becomes a much closer issue. Under Rule 613, extrinsic evidence of prior inconsistent statements of a witness is admissible so long as the "witness is afforded an opportunity to explain or

deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon."

We specifically addressed the tension between Rule 608(b) and Rule 613 in *United States v. McGee*, 408 F.3d 966, 981-82 (7th Cir. 2005). In *McGee*, the government sought to introduce tape-recorded phone calls from the Metropolitan Correctional Center (MCC) in which the defendant, Smith, told his boss an elaborate lie regarding his whereabouts and then called his wife and laughed about the lie he told his boss. 408 F.3d at 980-81. The government prefaced the introduction of these tapes with the question, "Have you ever made up a story regarding your situation in this case to get out of a jam, Mr. Smith?" *Id.* Smith answered, "[N]o." *Id.* The district court allowed the introduction of these tapes based on the contradiction between Smith's answer to the question posed at trial and Smith's admission on the tape that he lied to his boss. *Id.* at 981. In finding that the district court erred in admitting the tapes, we reasoned,

> the force of the MCC phone call recording was not due to a comparison of Smith's statements and his equivocations at trial. Rather, Smith's elaborate lie to his supervisor, in and of itself, cast significant doubt on Smith's character for truthfulness. For this reason, the MCC tape falls squarely within the ambit of Rule 608(b), and it was error for the district court to allow the government to play the tape.

*Id.* at 982.

Based on our reasoning in *McGee* and the arguments of appellants on the record, Davidovic's letters fall within

the ambit of Rule 608(b). Similar to the MCC tapes in *McGee*, the probative value of Davidovic's letters is his underlying lie, not the contradiction between his state- ment at trial and the content of the letter. This is clear from appellants' arguments that these letters "go[ ] straight to the issue of his truthfulness, veracity, or lack thereof," and that they are an "admission by the witness that he is able to lie and use deceit to achieve his own goals." This is precisely the type of evidence of character for truthfulness that Rule 608(b) controls and prohibits. By asking Davidovic whether he had lied in this case and then arguing that the letters were contradiction evidence admissible under Rule 613, appellants attempted to sneak the letters through the loophole between Rule 608(b) and Rule 613 that we closed in *McGee*.

Moreover, even if we found that Rule 613 governed, these letters still have admissibility problems. The record indicates that the district court found that these letters were not in direct contradiction with Davidovic's trial testimony. Selmo Cadet being the Haitian referred to in the letters is crucial to appellants' argument that these letters directly contradict Davidovic's testimony that he never told lies in this case. Davidovic testified that he was not sure that he knew Selmo Cadet, the only Haitian involved in this case. Therefore, it is unclear from the testimony that the individual mentioned in the letter is Selmo Cadet. The district court made it clear that it would reconsider its ruling depending on how the evi- dence developed. However, appellants made no further attempts to develop the evidence connecting the Haitian referred to in the letter to Selmo Cadet. Based on this

record, the district court did not abuse its discretion in excluding this evidence, even under Rule 613.

Finally, even if this evidence were admissible as contradiction evidence and the district court erred in excluding it, the error was harmless. Davidovic's testimony was only a small piece of a much larger case. Davidovic's testimony did not inculpate Perry in any manner and only addressed one of the counts for Neighbors, Sims, and Taylor. Additionally, had this evidence been admissible, it would have been admissible for the limited probative value of showing a contradiction between Davidovic's testimony on the stand and his earlier statement in the letter. It would not have been admissible as a sweeping admission by Davidovic that "he is able to lie and use deceit to achieve his own goals," as appellants argued. In light of this limited probative value and the plethora of evidence other than Davidovic's testimony, the exclusion of this evidence, if an error, was harmless.

### E.  Motion for Directed Verdict

The indictment charged all appellants with a conspiracy to possess and distribute both crack cocaine and powder cocaine. After the trial, the jury returned a special verdict form finding: (1) Neighbors engaged in a conspiracy to distribute in excess of 50 grams of cocaine base and less than 500 grams of cocaine hydrochloride; (2) Taylor engaged in a conspiracy to distribute in excess of 50 grams of cocaine base; (3) Sims engaged in a conspiracy to distribute in excess of 50 grams of cocaine base; and (4) Perry engaged in a conspiracy to distribute

less than five grams of cocaine base. On the special verdict forms, the jury did not find that Taylor, Sims, and Perry engaged in a conspiracy to distribute less than 500 grams of powder cocaine, as the indictment charged. After the jury returned the special verdict, appellants Taylor, Sims and Perry moved for a directed verdict based on the variance between the verdict and indictment. The district court denied appellants' motion.

On appeal, appellants Taylor, Sims, and Perry argue that the district court erred when it did not grant the motion for a directed verdict. We grant great deference to the jury verdict when reviewing a denial of a motion for a judgment notwithstanding the verdict. *United States v. Melendez*, 401 F.3d 851, 854 (7th Cir. 2005). We evaluate a conspiracy variance claim to determine, viewing the evidence in a light most favorable to the government, whether the evidence is sufficient to support the existence of the single conspiracy charged in the indictment. *United States v. Williams*, 272 F.3d 845, 862 (7th Cir. 2001).

Although the special verdict form does vary from the indictment, this variance is not fatal. The general rule that allegations and proof must correspond serves the purpose of ensuring that the accused is informed of the charges against him so that he can prepare his defense and so he may be protected against a second prosecution for the same offense. *United States v. Cassell*, 452 F.2d 533, 536 (7th Cir. 1971). However, if these ends are met, a variance between the allegations and proof is not fatal. *Id.* When the government proves a subset of the

charged conspiracy, the variance between the indictment and the trial evidence does not become fatal because the indictment adequately notified the defendant of the government's allegations. *United States v. Payne*, 226 F.3d 792, 795 (7th Cir. 2000). We have established that a particular offense is a subset of the charged conspiracy when the government need not prove any additional elements to prove the particular offense than they would need to prove the charged conspiracy. *United States v. Boyles*, 57 F.3d 535, 544 (7th Cir. 1995). Based on this definition, a conspiracy to distribute crack cocaine is a subset of a conspiracy to distribute both crack cocaine and powder cocaine. Therefore, because the defendants had adequate notice of the government's allegations and suffered no prejudice from this variance, we find that the jury's general verdict should stand.

**F. Sentencing**

At sentencing, the district court sentenced Neighbors to a life sentence, Perry to 327 months, and Sims and Taylor to 240 months each. Appellant Perry challenges his sentence of 327 months as an abuse of discretion by the district court. We review a district court's sentencing decision for reasonableness, using an abuse of discretion standard. *United States v. Omole*, 523 F.3d 691, 696 (7th Cir. 2008). A sentence that falls within a properly calculated guideline range carries a presumption of reasonableness. *Id.*

Perry admits that the district court correctly calculated the sentencing range to be between zero and thirty years.

However, Perry claims that the district court still acted unreasonably by sentencing him to the highest end of his guideline range while choosing the lowest possible point in the guideline range for Sims and Taylor. Perry points to the special verdict form where the jury found that Perry engaged in a conspiracy to distribute less than five grams of cocaine base. He contrasts this with the jury's special finding that Sims and Taylor each engaged in a conspiracy to distribute in excess of fifty grams of cocaine base. While the disparity in the sentences is noticeable, the district court explained its choice at sentencing. The district court indicated that it chose the high end of the guideline range for Perry because of his status as a career offender and his inability to conform his conduct to the rule of law. Neither Sims nor Taylor qualify as a career offender. Because Perry's sentence falls within the guideline range and the district court explained its decision for choosing the highest possible point in the range, the district court did not abuse its discretion in sentencing Perry to 327 months.

### III. Conclusion

For the foregoing reasons, we AFFIRM all appellants' convictions and appellant Perry's sentence.