In the

# United States Court of Appeals
## For the Seventh Circuit

No. 14-1869

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

KEVIN MARK TRUDEAU,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 10 CR 886 — **Ronald A. Guzmán**, *Judge.*

ARGUED FEBRUARY 24, 2015 — DECIDED FEBRUARY 5, 2016

Before EASTERBROOK, ROVNER, and SYKES, *Circuit Judges*.

SYKES, *Circuit Judge*. Kevin Trudeau spent his career hawking miracle cures and self-improvement systems of dubious efficacy. When the Federal Trade Commission sued him for violating consumer-protection laws, Trudeau agreed to a consent decree in which he promised not to misrepresent the content of his books in TV infomercials. A few years later, Trudeau published *The Weight Loss Cure "They" Don't Want You to Know About* and promoted it in three infomer-

cials. The ads said the weight-loss protocol was "simple" and "inexpensive," could be completed at home, and did not require any food restrictions or exercise. The book, on the other hand, described an arduous regimen mandating prescription hormone injections and severe dietary and lifestyle constraints.

The district court imposed a civil contempt sanction and then issued an order to show cause why Trudeau should not be held in criminal contempt and face a penalty of up to six months' imprisonment. At Trudeau's request the case was transferred to a different judge. The new judge issued an amended show-cause order that removed the six-month penalty cap. Trudeau was convicted and sentenced to ten years in prison.

On appeal Trudeau leaves no stone unturned. His primary argument concerns an alleged violation of the Speedy Trial Act. *See* 18 U.S.C. §§ 3161 *et. seq*. More than 70 non-excludable days elapsed between the date the government agreed to prosecute the first show-cause order and the commencement of trial under the second show-cause order. Trudeau moved to dismiss for violation of the Act. The district judge denied this motion. He was right to do so. The Act applies only to crimes punishable by more than six months' imprisonment. Because the first show-cause order capped the potential penalty at six months, the Act did not apply. The second show-cause order removed the cap, triggering the Act's 70-day clock, but Trudeau's trial began within the mandatory timeframe counting from that date. There was no Speedy Trial Act violation.

Trudeau raises an array of other issues as well: He challenges the jury instruction on "willfulness," the sufficiency

of the evidence, two evidentiary rulings, and the reasonableness of his sentence. These arguments, too, are meritless. We affirm the contempt conviction and sentence.

## I. Background

Trudeau's bag of tricks contains something to relieve almost any ailment or burden. His infomercials have peddled products like "Biotape" (to cure severe pain); "Coral Calcium Supreme" (to cure cancer); "Howard Berg's Mega Read" (to increase reading speed tenfold); and "Kevin Trudeau's Mega Memory System" (to unlock photographic memory). Because Trudeau's pitches are factually indefensible, the FTC has repeatedly pursued him for violating consumer-protection laws. To settle one of these suits, Trudeau agreed to the entry of a consent decree in which he promised not to market products without the FTC's approval. He soon decided he wanted more leeway to write books, however, and in September 2004 negotiated a modified consent order that permitted him to star in infomercials for his books provided that "the infomercial for any such book … must not misrepresent the content of the book." Soon after, Trudeau released a book about "natural cures" and produced a promotional infomercial for it. Although the consent order did not require him to do so, Trudeau sent the transcript to the FTC, which indicated its approval. This ad aired without objection.

In 2007 Trudeau published another book, *The Weight Loss Cure "They" Don't Want You to Know About*, which described a complex regimen designed to reduce hunger by "resetting" the hypothalamus. We detailed the book's weight-loss system in *FTC v. Trudeau* (*Trudeau I*) 579 F.3d 754, 758–59 (7th Cir. 2009), so we provide only a summary here. The reg-

imen consists of four phases (two of which are "strongly recommended" but not obligatory), each with a strict list of dietary and lifestyle dos and don'ts. For example, most or all of the phases—including phase 4, which lasts a lifetime—involve abstaining from artificial sweeteners, chain restaurants, prescription and over-the-counter medication, food cooked in microwaves, air conditioning, and fluorescent lighting. Program participants are also instructed to walk an hour a day; eat only organic food; do liver, parasite, heavy-metal, and colon cleanses; and receive colonics, which are enema-like procedures performed by specialists. Phase 2, which is mandatory and lasts between 21 and 45 days, is particularly arduous and requires a 500-calorie-per-day diet and daily injections of human chorionic gonadotropin, a hormone only available by prescription and not indicated for weight loss.

Trudeau promoted *The Weight Loss Cure* in three different 30-minute infomercials staged as scripted conversations between an interviewer and himself. But the protocol Trudeau talked about in the infomercials bore little resemblance to the one described in his book. In the ads he said that the weight-loss protocol was "very inexpensive," could be done at home, and was "the easiest [weight-loss] method known on planet Earth." He also represented that once the protocol was complete, dieters could eat "everything they want, any time they want." The weight-loss program described in the infomercials sounded too good to be true, and it was. Trudeau never mentioned the dietary or lifestyle restrictions, injections, cleanses, or colonics mandated in the book.

The FTC took Trudeau back to court for violating the 2004 consent order. The district court (Judge Gettleman pre-

siding) found that the infomercials misrepresented the content of *The Weight Loss Cure*, despite Trudeau's jesuitical attempts to harmonize them. Judge Gettleman held Trudeau in civil contempt and entered a $37.6 million judgment against him, an amount equal to the gross revenue from books sold through the infomercials. We upheld the contempt finding in *Trudeau I*, *id.* at 768, and the monetary sanction in *FTC v. Trudeau* (*Trudeau II*), 662 F.3d 947, 949–50 (7th Cir. 2011).

After imposing the civil sanction, Judge Gettleman issued an order to show cause why Trudeau should not also be held in criminal contempt for the same conduct. Under this show-cause order, dated April 16, 2010, Trudeau faced imprisonment of not more than six months. On April 29, 2010, the U.S. Attorney's Office agreed to prosecute the case. At that time the prosecutor told the judge: "I think because this is a criminal proceeding, the Speedy Trial Act would … apply." She sought and received an exclusion of time that same day, tolling the Act's 70-day clock. In the weeks that followed, the judge granted three subsequent requests for exclusion of time.

Trudeau eventually asked that the criminal proceedings be reassigned to a new judge. Judge Gettleman exercised his prerogative as a senior judge to have the case transferred. On October 19, 2010, it was reassigned to Judge Guzmán. Unfortunately, neither the government nor Trudeau received notice of the reassignment (or the new criminal case number), and the case sat idle until the parties discovered the oversight. A status hearing was finally held on April 7, 2011. By that time more than 150 nonexcludable days had

elapsed since the government agreed to prosecute Judge Gettleman's show-cause order.

At the April 7 hearing (and in subsequent briefing), Trudeau sought dismissal for violation of the Speedy Trial Act. The government responded that, properly understood, Judge Gettleman's show-cause order was outside the scope of the Act. The Act applies to "any case involving a defendant charged with an offense," 18 U.S.C. § 3161(a), and "offense" is defined as "any Federal criminal offense … *other than* a Class B or C misdemeanor or an infraction," *id.* § 3172(2) (emphasis added). Federal crimes are generally classified based on their maximum penalty, and Class B misdemeanors are punishable by not more than six months' imprisonment. *Id.* § 3559(a)(7). Because Judge Gettleman's show-cause order capped Trudeau's sentence at six months, Judge Guzmán determined that it was analogous to a Class B misdemeanor and therefore the Act did not apply.

At the same April 7 hearing, the government asked Judge Guzmán to withdraw the initial show-cause order and issue an amended one without the six-month cap. The prosecutor argued that an uncapped order would be more appropriate given the serious nature of the contempt and Trudeau's history of disobeying court orders. On December 7, 2011, Judge Guzmán agreed to issue a new show-cause order and told the parties that the original order would be dismissed when the new one was entered. An amended, uncapped show-cause order issued the next day.

The contempt charge was tried to a jury over six days beginning on November 5, 2013. The parties agree that if the speedy-trial clock started when Judge Guzmán entered the new, uncapped show-cause order, the trial commenced

within the time period required by the Act. The jury convicted Trudeau of contempt, and Judge Guzmán imposed a ten-year prison sentence, well below the guidelines range of 235 to 293 months.

## II. Discussion

### A. The Speedy Trial Act

The Speedy Trial Act requires most criminal trials to begin within 70 days of (1) "the filing date (and making public) of the information or indictment," or (2) "the date the defendant has appeared before a judicial officer of the court in which such charge is pending, whichever date last occurs." 18 U.S.C. § 3161(c)(1). Time can be excluded from the 70-day limit for a variety of reasons. *See id.* § 3161(h). The primary remedy for a violation of the Act is dismissal of the charge, with or without prejudice depending on the court's evaluation of a set of statutory factors. *See id.* § 3162(a)(2). We review the district court's interpretation of the Act de novo and its factual findings for clear error. *United States v. Loera*, 565 F.3d 406, 411 (7th Cir. 2009).

The parties initially disagreed about how many nonexcludable days elapsed in total, but Trudeau now accepts the government's figures—214 nonexcluded days passed between April 29, 2010, when the government agreed to prosecute Judge Gettleman's show-cause order, and December 8, 2011, when Judge Guzmán entered the new, uncapped order. As we've noted, Trudeau also agrees that the Act was properly applied if time is counted from the date of the second order until the start of trial in November 2013. But if the speedy-trial clock started running back in April 2010, as

Trudeau contends, then the case should have been dismissed, though not necessarily with prejudice.

### 1. *Estoppel*

Trudeau contends that the government is estopped from arguing that the April 2010 show-cause order wasn't subject to the Act because the prosecutor initially told Judge Gettleman that it was. Judicial estoppel "prevents a party from prevailing on an argument in an earlier matter and then relying on a contradictory argument to prevail in a subsequent matter." *Wells v. Coker*, 707 F.3d 756, 760 (7th Cir. 2013). Estoppel is "an equitable doctrine invoked by a court at its discretion," *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001), so the decision not to apply it is reviewed for abuse of discretion, *see In re Knight–Celotex, LLC*, 695 F.3d 714, 721 (7th Cir. 2012).[1]

Judge Guzmán was well within his discretion in declining to estop the government. First, the government did not "prevail" over Trudeau when it initially took the position that the Act applied to the first show-cause order. Trudeau held the identical view, so it makes just as much sense to say that Trudeau prevailed over the government. Second, Trudeau did not suffer any "unfair detriment" as a result of the government's changed view. *New Hampshire*, 532 U.S. at 751. He wasn't disadvantaged by the government's earlier posi-

---

[1] The government argues that Trudeau failed to raise this argument in the district court, so at most plain-error review applies. It's true that Trudeau did not use the word "estoppel" before the district court, but he *did* object that "the government's recent position is inconsistent with the position it repeatedly took [earlier]." That's sufficient to preserve the issue.

tion and never meaningfully relied on it. In fact, Judge Get-
tleman never explicitly held that the show-cause order was
covered by the Act, a holding that would have been errone-
ous in any event, as we'll explain in a moment. Instead,
Judge Gettleman appears to have simply assumed—along
with everyone else—that the Act applied and proceeded ac-
cordingly.

### 2. *The Speedy Trial Act in the Context of Contempt*

Two distinctive features of criminal contempt complicate
the task of directly applying the Act to contempt prosecu-
tions. The first is that unlike other crimes, contempt can be
charged through a court-issued show-cause order that the
government later agrees to prosecute. The Speedy Trial Act,
however, calculates the 70-day clock by reference to the date
that either the "information or indictment" is made public or
the defendant initially appears in court on "such charge,"
whichever is later. § 3161(c)(1).

The government argued in the district court that because
show-cause orders are not mentioned in the Act, this con-
tempt prosecution is outside its scope. The government has
abandoned this argument on appeal and now concedes that
the Act can be triggered when the government accepts a
judge's referral to prosecute an alleged contempt. The gov-
ernment was right to make this concession.[2]

---

[2] In an analogous context, in *Gompers v. United States*, the Supreme Court
held that criminal contempt is covered by a statute of limitations even
though the statute in question only mentioned "the information" and
"the indictment." 233 U.S. 604, 611 (1914) ("What follows is a natural
way of expressing that the proceedings must be begun within three
years; indictment and information being the usual modes by which they
are begun, and very likely no other having occurred to those who drew

The second unusual feature of criminal contempt is that it carries no statutorily authorized maximum punishment. *See* 18 U.S.C. § 401 ("A court of the United States shall have power to punish by fine or imprisonment, or both, at its discretion, … contempt of its authority … ."). The Speedy Trial Act applies to all offenses more serious than a Class B misdemeanor—that is, offenses punishable by more than six months' imprisonment—regardless of the actual sentence imposed. *See* § 3172(2). Trudeau argues that because the criminal contempt statute does not authorize a maximum penalty, Judge Gettleman's show-cause order charged him with a crime punishable by up to life in prison, notwithstanding the order's six-month penalty cap.

This argument is hard to square with the approach the Supreme Court has taken in the analogous context of the right to trial by jury in contempt prosecutions. The Sixth Amendment's jury-trial right applies if the charged crime is "serious" rather than "petty" (and "petty" means punishable by imprisonment of six months or less). *See Frank v. United*

---

the law."), *overruled in part on other grounds, Bloom v. Illinois*, 391 U.S. 194, 207 (1968). Moreover, the Judicial Conference views criminal contempt as covered by the Speedy Trial Act. *See* 106 F.R.D. 271, 310 (December 1979 revision (with amendments through October 1984)) ("[T]he Committee [on the Administration of Criminal Law] is of the view that the act does apply to contempts … and that the notice on which prosecution is based should be treated as an information for purposes of calculating the 70-day time limit to trial."). More broadly, the Act's legislative history conveys Congress's expansive purpose of "giv[ing] real meaning to th[e] Sixth Amendment right" to a speedy trial, H.R. REP. NO. 93-1508 (1974), *reprinted in* 1974 U.S.C.C.A.N. 7401, 7404, and there's no question that contempt prosecutions are covered by the constitutional speedy-trial guarantee.

*States*, 395 U.S. 147, 148 (1969). In *Frank* a contemnor had been convicted after a bench trial and sentenced to probation; he contended that he was entitled to a jury trial under the Sixth Amendment. As Trudeau does here, the contemnor in *Frank* argued that because there is no maximum punishment for contempt, it was necessarily a "serious" crime. *Id.* The Court disagreed, explaining that "Congress … has not categorized contempts as 'serious' or 'petty.'" *Id.* at 149 (citation omitted); *see also Cheff v. Schnackenberg*, 384 U.S. 373, 380 (1966) (describing contempt as "an offense sui generis"). Given the broad range of potentially contumacious behavior, the Court held that "in prosecutions for criminal contempt where no maximum penalty is authorized, the severity of the penalty *actually imposed* is the best indication of the seriousness of the particular offense." *Frank*, 395 U.S. at 149 (emphasis added); *see also Bloom v. Illinois*, 391 U.S. 194, 211 (1968) (same for state-court contempt convictions). Because the contemnor in *Frank* was not sentenced to any term of imprisonment at all, his contempt was properly treated as a petty offense and the Sixth Amendment's jury-trial right was not implicated. *Frank*, 395 U.S. at 152.

As applied here, the Court's reasoning in *Frank* includes a logical corollary: If the document initiating the contempt prosecution caps the sentence at six months or less, then it's not necessary to wait until sentencing to know whether the Speedy Trial Act will apply—it won't. Indeed, the Court said its post hoc analysis applies to "prosecutions for criminal contempt *where no maximum penalty is authorized.*" *Id.* at 149 (emphasis added). A show-cause order capping a contempt sentence at six months is analogous to an indictment for a Class B misdemeanor, which carries a maximum penalty of six months. Class B misdemeanors are not covered by the

Act. As such, neither was Judge Gettleman's show-cause order.[3]

Nor did Judge Guzmán's later, uncapped order—effectively a new charging instrument—make Judge Gettleman's earlier order retroactively subject to the Act. And because the trial began within 70 nonexcluded days after Judge Guzmán's show-cause order, there was no Speedy Trial Act violation.

Trudeau insists that this result conflicts with the Act's approach to reprosecutions. The Act provides that if "any charge contained in a complaint … is dismissed or otherwise dropped" and the defendant is later reindicted for "an offense based on the same conduct or arising from the same criminal episode," then the 70-day clock resets and runs anew from the date of the second indictment. 18 U.S.C. § 3161(d)(1); *see United States v. Hemmings*, 258 F.3d 587, 593 (7th Cir. 2001); *United States v. Myers*, 666 F.3d 402, 404–05 (6th Cir. 2012); *United States v. Napolitano*, 761 F.2d 135, 137 (2d Cir. 1985) ("Congress considered and rejected [the] suggestion that the Act's dismissal sanction be applied to subsequent charges if they arise from the same criminal episode as those specified in the original complaint … ."). This is true even if the dismissal remedies a violation of the Act. *See, e.g., United States v. Sykes*, 614 F.3d 303, 307 (7th Cir. 2010). In

---

[3] Two other circuits have addressed this issue and reached the same conclusion, albeit in unpublished orders. *See United States v. Moncier*, 492 F. App'x 507, 510 (6th Cir. 2012); *United States v. Richmond*, 312 F. App'x 56, 57 (9th Cir. 2009).

other words, the baseline rule is that a new charge gets a new clock.

There is, however, one notable exception to this rule. Section 3161(h) lists periods of delay that must be excluded from the 70-day calculation. Under § 3161(h)(5), "[i]f the information or indictment is dismissed *upon motion of the attorney for the* [*g*]*overnment* and thereafter a charge is filed against the defendant for the same offense, or any offense required to be joined with that offense," the clock does not reset with the issuance of a second charge. (Emphasis added.) Rather, the clock runs from the date of the initial charge and excludes any intermediate period when no charge is outstanding. *See United States v. Rein*, 848 F.2d 777, 780 (7th Cir. 1988).

But this exception can't apply when the first charge did not itself fall under the Act. Section 3161(h) supplies a list of circumstances under which time must be *excluded*. It follows that if the speedy-trial clock did not start running with the first prosecution (because it was not covered by the Act), then *zero* nonexcluded days have accumulated before the start of the second prosecution. "Excluded days" only exist by reference to the Act. Nothing in § 3161(h)(5) implies that a judge is permitted to look back at the first indictment and retroactively exclude days that could not have been excluded initially. Accordingly, where, as here, an offense covered by the Act is charged following one that was *not* covered, the 70-day clock starts on the day that the eligible prosecution begins.

Trudeau tries an alternative approach, arguing that Judge Guzmán's order was akin to a superseding indictment rather than a reindictment. A superseding indictment is is-

sued without the initial charge first being dismissed. *See United States v. Johnson*, 680 F.3d 966, 973 n.3 (7th Cir. 2012) ("In sum, when a superseding indictment is filed there is only one criminal action; a reindictment results in two." (quoting *United States v. Hoslett*, 998 F.2d 648, 658 (9th Cir. 1993))). In the Speedy Trial Act context, "a superseding indictment restating or correcting original charges does not restart the seventy-day clock." *Hemmings*, 258 F.3d at 593. This follows logically from the fact that no charge is dismissed under § 3161(d)(1) when the government issues a superseding indictment, so the clock runs continuously from the date of the initial charge.

Even if we treated Judge Guzmán's order as a superseding indictment, however, there would be no Speedy Trial Act violation in this case. As we've just explained, if the Act did not apply to the initial charge, then the superseding indictment—to which the Act *does* apply—doesn't retroactively start the speedy-trial clock from the date of the initial charge. If the new charge triggers the Speedy Trial Act for the first time, the clock begins to run when the new, elevated charge is filed. Here, Judge Guzmán's uncapped show-cause order started the speedy-trial clock for the first time.

### 3. *Gilding*

Trudeau's final argument is that even if the Act did not apply to the first show-cause order, the second show-cause order was nonetheless improper because it merely "gilded" the first one. This argument rests on two cases suggesting that "if the crimes for which a defendant is ultimately prosecuted really only gild the charge underlying his initial arrest and the different accusatorial dates between them are not reasonably explicable, the initial arrest may well mark the

speedy trial provision's applicability as to prosecution for all the interrelated offenses." *United States v. DeTienne*, 468 F.2d 151, 155 (7th Cir. 1972); *see also United States v. Juarez*, 561 F.2d 65, 68 (7th Cir. 1977). Trudeau notes that nothing changed between the two show-cause orders other than identity of the presiding judge. That difference, he says, does not make the different prosecutorial start dates "reasonably explicable."

*DeTienne* and *Juarez* both concerned the Sixth Amendment speedy-trial right, not the Speedy Trial Act, which *DeTienne* in fact predated. Trudeau hasn't raised a Sixth Amendment argument; he relies solely on the Act, which provides its own detailed instructions about how reprosecutions should be handled. We've never applied a gilding theory in a Speedy Trial Act case, and other courts have questioned its doctrinal vitality. *See, e.g.*, *United States v. Watkins*, 339 F.3d 167, 177 (3d Cir. 2003); *see also United States v. Williams*, No. 09-CR-29, 2009 WL 1119417, at *3 (E.D. Wis. Apr. 27, 2009) (no gilding); *United States v. Toader*, 582 F. Supp. 2d 987, 990–91 (N.D. Ill. 2008) (same).

We see no reason to gloss the statute with a gilding doctrine, especially in a case with no evidence of bad-faith abuse of the Act by the government. As a general matter, the risk of improper evasion of the Act by the government is particularly low in a judge-initiated contempt proceeding. And because Trudeau requested that his case be transferred out of Judge Gettleman's court, the government can't be accused of judge shopping. We doubt that the gilding doctrine can ever overcome the terms of the Speedy Trial Act, but we are certain it does not do so here.

**B. Jury Instruction on "Willfulness"**

Trudeau's next argument is a claim of instructional error. He contends that the jury instruction on the elements of contempt misstated the "willfulness" element of the offense. "The essential elements of a finding of criminal contempt under 18 U.S.C. § 401(3) are a lawful and reasonably specific order of the court and a willful violation of that order." *Doe v. Maywood Hous. Auth.*, 71 F.3d 1294, 1297 (7th Cir. 1995). The text of § 401(3) doesn't contain a willfulness requirement, but we, like all circuits, hold that it is a necessary element that must be proved beyond a reasonable doubt. *Id*.

In this context, "willfulness" means "a volitional act done by one who knows or should reasonably be aware that his conduct is wrongful." *United States v. Greyhound Corp.*, 508 F.2d 529, 531–32 (7th Cir. 1974). The phrase "should reasonably be aware" describes the mental state of recklessness, meaning that the defendant was "conscious of a substantial risk that the prohibited events will come to pass." *United States v. Mottweiler*, 82 F.3d 769, 771 (7th Cir. 1996) (citing *Farmer v. Brennan*, 511 U.S. 825 (1994)); *cf.* MODEL PENAL CODE § 2.02(2)(c) (1962) ("A person acts recklessly … when he consciously disregards a substantial and unjustifiable risk that a material element exists or will result from his conduct.").

The government first proposed a jury instruction on willfulness,[4] and Trudeau then offered several modifications with the stated intent of making the instruction more closely

---

[4] There are no model jury instructions for criminal contempt in this circuit. *See* FEDERAL CRIMINAL JURY INSTRUCTIONS OF THE SEVENTH CIRCUIT p.163 (2012).

mirror *Mottweiler*'s definition of "recklessness." The government agreed to the proposed modifications. The final instruction was as follows, with Trudeau's additions in bold, his deletions struck through, and subsequent technical edits in brackets:

> A violation of a court order is willful if it is a volitional act done by one who knows or should reasonably be aware that his conduct is wrongful. A person should reasonably be aware that his conduct is wrongful if he ~~knows about~~ **is conscious of** a substantial **and unjustifi[able]** risk that ~~his actions~~ **the prohibited event** ~~will lead to a violation of the court order,~~ **(here violation of the September [2], 200[4] Court Order) will come to pass** and ~~he~~ disregards that risk.

> In deciding whether the defendant acted willfully, you may consider all of the evidence, including what the defendant did or said.

Trudeau informed the judge that the jury instructions were "agreed to" as modified, and they were given to the jury without further modification by the court.

Trudeau now argues—for the first time on appeal—that recklessness isn't sufficient to satisfy the "willfulness" element of contempt. He points out that the Supreme Court has interpreted the "willfulness" element of certain criminal statutes to require the government to prove that the defendant *knew* that his conduct violated the law, not merely that the defendant was *reckless* with respect to the illegality of his actions. *See Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 58 n.9

(2007) (collecting cases). He says his case "presents an excellent opportunity for the [c]ourt to revisit *Greyhound*" and overrule it.[5] *See* 7TH CIR. R. 40(e).

Quite the contrary. "We have repeatedly held that approval of a jury instruction in the district court extinguishes any right to appellate review of the instruction." *United States v. Yu Tian Li*, 615 F.3d 752, 757 (7th Cir. 2010). Trudeau expressly approved the willfulness instruction after offering modifications that were accepted in toto. He cannot now argue that the instruction was wrong. *See id*. ("Having proposed a jury instruction virtually identical to the instruction actually used by the district court, [the defendant] cannot now contest that instruction."); *see also* FED. R. CRIM. P. 30(d) ("A party who objects to any portion of the instructions … must inform the court of the specific objection … . Failure to object … precludes appellate review, except as permitted under [plain-error review].").

Trudeau tries to rescue his waived argument by suggesting it was merely *forfeited* because any objection in the district court would have been futile in light of *Greyhound*'s status as binding precedent. Wrong again. Trudeau could have preserved a challenge to the continuing vitality of *Greyhound* even though the district court would have been bound by

[5] The circuits are split over whether "knowledge" or "recklessness" is the appropriate *mens rea* in criminal contempt cases. *Compare United States v. Cheeseman*, 600 F.3d 270, 281 (3d Cir. 2010) (knowledge), *and United States v. Mourad*, 289 F.3d 174, 180 (1st Cir. 2002) (knowledge), *with United States v. Iqbal*, 684 F.3d 507, 512 (5th Cir. 2012) (recklessness); *United States v. Smith*, 497 F. App'x 269, 273 n.11 (4th Cir. 2012) (recklessness); *and United States v. Rapone*, 131 F.3d 188, 195 (D.C. Cir. 1997) (recklessness).

that decision. *Cf. Dixon v. United States*, 548 U.S. 1, 4 (2006) (considering the arguments of a petitioner who preserved her objection to a well-settled jury instruction by objecting to it even though "the trial court, correctly finding itself bound by Circuit precedent, denied petitioner's request").

In any case, Trudeau's argument fails even if only forfeited. Forfeiture permits review for plain error, and "[a]n error is plain if it was (1) clear and uncontroverted at the time of appeal and (2) affected substantial rights, which means the error affected the outcome of the district court proceedings." *United States v. DiSantis*, 565 F.3d 354, 361 (7th Cir. 2009) (internal quotation marks omitted). The willfulness instruction was—and is—perfectly in line with controlling precedent in this circuit. Trudeau's argument rests on cases interpreting statutory-willfulness requirements in other contexts, not the judicially implied willfulness requirement in criminal contempt. We have emphasized that "willful" "is a 'word of many meanings,' and 'its construction [is] often … influenced by its context.'" *Ratzlaf v. United States*, 510 U.S. 135, 141 (1994) (quoting *Spies v. United States*, 317 U.S. 492, 497 (1943)) (alteration in original).

Trudeau relies on *United States v. Holmes*, 93 F.3d 289 (7th Cir. 1996), but to no avail. In *Holmes* the defendant failed to object to a jury instruction that was in line with circuit precedent. *Id*. at 292. After his trial but before his appeal, the Supreme Court held that a jury instruction identical to the one used at his trial was mistaken as a matter of law. *Id*. We held that the defendant's forfeited objection was reviewable for plain error and that in light of the Court's intervening decision invalidating an identical instruction, the plain-error standard was satisfied. *Id*. at 292–93.

Here, in contrast, Trudeau can point to no authority that makes the willfulness instruction used at his trial plainly erroneous. We would need to exercise plenary review to overturn existing circuit precedent in the absence of an on-point holding of the Court.

Finally, Trudeau calls our attention to *Elonis v. United States*, 135 S. Ct. 2001 (2015), a decision issued after we heard oral argument in this case. *Elonis* held that although the federal statute criminalizing threats does not specify a mental state, *see* 18 U.S.C. § 875(c), negligence isn't enough, *Elonis*, 135 S. Ct. at 2011. The Court expressly declined to decide whether recklessness would have sufficed. *Id*. at 2013. *Elonis* does not call *Greyhound* into doubt.

## C. Sufficiency of the Evidence

Trudeau next challenges the sufficiency of the government's evidence. This is always a heavy lift, and it's especially so here. *See United States v. Reed*, 744 F.3d 519, 526 (7th Cir. 2014) ("We will overturn a verdict for insufficiency of the evidence only if, after viewing the evidence in the light most favorable to the government, the record is devoid of evidence from which a rational trier of fact could find guilt beyond a reasonable doubt.").

Trudeau's main contention is that the government presented no "state-of-mind evidence" from which the jury could conclude that he willfully violated the consent order. He argues that without direct evidence of his mental state, the jury was left to choose between several equally plausible benign explanations for his misrepresentations. He suggests, for example, that the misrepresentations might have been attributable to the possibility that he left his glasses at home

and misread the teleprompter (while filming each of three infomercials?). Or the teleprompter might have been negligently loaded with an unedited version of the script (and he was unaware that the words he spoke bore little resemblance to the book he wrote?).

Setting aside the obvious implausibility of these fanciful explanations, the material point for our purposes is that the government had no obligation to present direct state-of-mind evidence. Rather, "the trier of fact is entitled to employ common sense in making reasonable inferences from circumstantial evidence." *United States v. Starks*, 309 F.3d 1017, 1021–22 (7th Cir. 2002). Needless to say, the jury's verdict is not called into doubt because a defendant can hypothesize on appeal a few alternative interpretations of the evidence. Trudeau was free to suggest his lost-eyeglasses or dysfunctional-teleprompter theories to the jury. The only question now is whether the evidence was adequate to prove each element of contempt beyond a reasonable doubt. We've previously explained that Trudeau's *The Weight Loss Cure* infomercials included "blatant misrepresentations" that were "patently false" and "outright lie[s]." *Trudeau I*, 579 F.3d at 766–68. It's no surprise that the jury reached the same conclusion. The evidence was easily sufficient to convict.

### D. Exclusion of Evidence

Trudeau also challenges the judge's exclusion of two categories of defense evidence. We review the district court's evidentiary rulings for abuse of discretion, *United States v. Foley*, 740 F.3d 1079, 1086 (7th Cir. 2014), and will reverse only if no reasonable person could take the judge's position, *United States v. Schmitt*, 770 F.3d 524, 532 (7th Cir. 2014). Even then, no remedy is available unless the error affected

the defendant's substantial rights, meaning that the average juror would have found the prosecution's case significantly less persuasive absent the erroneous evidentiary ruling. *Id.*; *see* FED. R. CRIM. P. 52(a).

**1.** *The* **Natural Cures** *Evidence*

Shortly after the 2004 consent decree took effect, Trudeau published a book called *Natural Cures "They" Don't Want You to Know About* and prepared an infomercial to promote it, as he had for other products and pitches. As we've explained, although the consent order didn't require the FTC's approval, Trudeau sent the Commission a transcript of the ad. The Commission had no objection, though it clearly stated that its approval was limited to this single transcript.

At trial Trudeau sought to introduce the *Natural Cures* book and infomercial and related correspondence with the FTC. The ostensible purpose was to show that he relied on the FTC's approval of the *Natural Cures* infomercial in interpreting the boundaries of the consent order's "no misrepresentations" clause. His theory was that if he had used the *Natural Cures* infomercial as a template for *The Weight Loss Cure* ads, it would have been more likely that he acted in good faith—and therefore did not willfully violate the consent order—when producing the infomercials at issue in this case. Trudeau wanted to introduce the *Natural Cures* evidence even if he did not testify that he actually used the FTC-approved infomercial as a template.

Trudeau made essentially the same argument in his civil contempt appeal. There, we said:

> Nothing about the FTC's prior approval should
> have led Trudeau to believe that he could se-

lectively quote his weight loss book as being "easy" and "simple," while leaving out nearly every relevant detail about the weight loss protocol. … The extent to which Trudeau could reasonably rely on the FTC's approval of the *Natural Cures* infomercial ended when Trudeau began uttering false statements and quotes that mischaracterized the content of the *Weight Loss Cure*[] book.

*Trudeau I*, 579 F.3d at 767–68. That analysis is not conclusive here, however, because civil and criminal contempt have different elements. Only criminal contempt requires willfulness. Thus, the issue is whether the *Natural Cures* evidence was relevant to Trudeau's state of mind.

The judge held that Trudeau first had to provide some evidence that he actually used *Natural Cures* as a template, probably through his own testimony. And even if he testified to that effect, the judge added this:

[The] template testimony is relevant only if there is evidence to suggest that defendant's use of the FTC-approved *Natural Cures* infomercial was *reasonable*, *i.e.*, that … the content of [the *Natural Cures* book and infomercial] is so similar to that of the *Weight Loss Cure* book and infomercials that approval of one *logically* includes the other. … [I]f [such evidence] does [exist], and [the] defendant offers template testimony, the *Natural Cures* evidence may be relevant to willfulness.

(Emphases added.)

The second step in the judge's analysis is mistaken. Because the willfulness element of criminal contempt is subjective, it was error to impose an objective "reasonableness" requirement.

The first step in the analysis is a closer call. The judge required Trudeau to testify or present circumstantial evidence linking the *Natural Cures* evidence to his state of mind. It's true that the state-of-mind inquiry is not a free-for-all in which *any* evidence that could *possibly* have influenced a defendant's mental state is *necessarily* relevant; if that were the case, "a defendant could introduce evidence that would invite the jury to speculate a non-existent defense into existence." *United States v. Zayyad*, 741 F.3d 452, 460 (4th Cir. 2014). When a defendant offers nothing but speculation to link a piece of evidence to his state of mind, the evidence is properly excluded unless the defendant offers corroboration that the evidence *in fact* influenced his mental state. *United States v. Kokenis*, 662 F.3d 919, 930 (7th Cir. 2011); *see also id*. ("Kokenis seems to be asserting that just because there may be evidence to show that *someone* could have had a good-faith belief that he wasn't violating the law, then *he* should be able to present such evidence to the jury. … Without any connection to his state of mind, such evidence is irrelevant.") (emphases added); *Zayyad*, 741 F.3d at 460 ("If the defendant wants to present a theory or belief that might have justified his actions, then he must present evidence that he in fact relied on that theory or belief."); *United States v. Curtis*, 782 F.2d 593, 599 (6th Cir. 1986) ("Unless there is a connection between the external facts and the defendant's state of mind, the evidence of the external facts is not relevant."). Often, but not necessarily, this corroboration comes in the form of the defendant's own testimony.

Whether the inferential gap between the proffered evidence and the defendant's mental state is great enough to require corroboration is necessarily a fact-specific inquiry. In *United States v. Kokenis*, for example, the defendant wanted experts to testify about an accounting theory that he claimed he relied on in good faith (but mistakenly) when calculating his taxes. *See* 662 F.3d at 930. Because the defendant could not offer any evidence that he in fact used that theory, or even knew about it, we held that the judge properly excluded the testimony as irrelevant. *Id.* In other cases we've held that evidence of this type was properly excluded when the link between the evidence and the defendant's state of mind was too attenuated or speculative. *See, e.g.*, *United States v. Beavers*, 756 F.3d 1044, 1050 (7th Cir. 2014) (conditioning the admissibility of evidence of the defendant's actions postarrest on his ability to link them to his mental state at the time of the crime); *Zayyad*, 741 F.3d at 460 (prohibiting cross-examination of witnesses about the "gray market" in diverted prescription drugs because the defendant had not shown that he knew about such markets); *Curtis*, 782 F.2d at 598–60 (excluding expert testimony that an area of tax law was unsettled and complex in the absence of evidence that the defendant himself was confused or relied on the expert's advice).

Although the district judge deserves significant deference in these determinations, we think Trudeau's case is distinguishable from the ones we've just mentioned. There is no question that Trudeau *knew* about the FTC's approval of the *Natural Cures* infomercial; he was the one who asked for it. And there's a logical link between that knowledge and his mental state: It stands to reason that Trudeau's experience with *Natural Cures*—his first infomercial after the consent

order—would have had at least *some* effect on the way he approached *The Weight Loss Cure* infomercials just two years later. Although a defendant's right against self-incrimination does not permit him to introduce evidence that would only be relevant in light of his testimony, *see Beavers*, 756 F.3d at 1051, the admission of evidence that is *independently* probative of a defendant's state of mind should not be conditioned on corroboration. Under the circumstances here, the basic relevance of the *Natural Cures* evidence strikes us as straightforward and should not have been conditioned on Trudeau's introduction of corroborating evidence.

If excluding this evidence was error, however, it was clearly harmless. Trudeau's infomercials for *The Weight Loss Cure* contained gross misrepresentations. As we said in *Trudeau I*, nothing about the FTC's approval of the *Natural Cures* infomercial gave a green light to blatant falsehoods. Furthermore, the large majority of misrepresentations in *The Weight Loss Cure* infomercials bore no relationship at all to the earlier infomercial for *Natural Cures*. For example, Trudeau said that *The Weight Loss Cure* involved no portion control (when it required extensive portion control); no food deprivation (when it required a strict diet); and no restrictions on what you could eat after finishing the protocol (when it had lifetime restrictions). Trudeau doesn't explain how the FTC's approval of the *Natural Cures* infomercial could possibly have led him to believe that these flagrant and highly specific misrepresentations were acceptable. The likelihood that the jury would have been swayed by this evidence is vanishingly small. Substantial justice does not require reversal.

### 2. *Misinterpretation of the Consent Decree's Terms*

Trudeau also wanted to present evidence that he simply misinterpreted the consent decree by construing it to permit statements of opinion and personal experiences protected by the First Amendment. The judge wouldn't allow it. That ruling was not an abuse of discretion.

A "mistaken interpretation" defense to criminal contempt requires a degree of plausibility and at least *some* evidence of good faith, both of which are utterly lacking here:

> To provide a defense to criminal contempt, the mistaken construction must be one which was adopted in good faith and which, given the background and purpose of the order, is plausible. The defendant may not avoid criminal contempt by "twisted interpretations" or "tortured constructions" of the provisions of the order.

*Greyhound*, 508 F.2d at 532 (quoting *United States v. Gamewell*, 95 F. Supp. 9, 13 (D. Mass. 1951)); *see also United States v. McMahon*, 104 F.3d 638, 644–45 (4th Cir. 1997) ("[A] person 'is not permitted to maintain a studied ignorance of the terms of a decree in order to postpone compliance and preclude a finding of contempt.'" (quoting *Perfect Fit Indus. v. Acme Quilting Co.*, 646 F.2d 800, 808 (2d Cir. 1981))).

Trudeau says he thought the consent decree preserved his First Amendment right to make statements of opinion or personal experience. As we've explained, however, the infomercials for *The Weight Loss Cure* are replete with blatant factual misrepresentations that could not possibly be classi-

fied as statements of opinion or personal experience. The judge was right to exclude this category of defense evidence.

**E. Reasonableness of Sentence**

Sanctions for criminal contempt are intended to be punitive and "to vindicate the authority of the court." *United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 828 (1994). Trudeau's guidelines range was 235 to 293 months, but the government recommended a below-guidelines sentence of ten years.[6] Judge Guzmán found that a within-guidelines sentence would be reasonable, but he adopted the government's recommendation and imposed a ten-year sentence.

Trudeau argues that ten years is disproportionate because Judge Gettleman initially thought a six-month sentence was sufficient. He also notes that the only contempt sentence in this circuit longer than his involved a witness's refusal to testify in a terrorism prosecution. *See United States v. Ashqar*, 582 F.3d 819, 822 (7th Cir. 2009). Finally, he suggests that his offense is less blameworthy than some frauds because each book buyer lost "only" $29.95 (plus shipping and handling).

A below-guidelines sentence will almost never be unreasonable, *United States v. Tahzib*, 513 F.3d 692, 695 (7th Cir. 2008), and this one certainly isn't. Although we don't know

---

[6] The Sentencing Commission instructs courts to use § 2B1.1, the guideline for Basic Economics Offenses, to calculate a sentencing range for contempt arising out of a violation of a court order enjoining fraudulent conduct. *See* U.S.S.G. §§ 2J1.1 cmt. n.3, 2X5.1. The main component of Trudeau's guidelines calculation was the combined $37.6 million lost by consumers who purchased *The Weight Loss Cure* book by calling the toll-free number publicized in the infomercials.

the rationale for the six-month cap on the initial show-cause order, nothing suggests that Judge Gettleman made a preliminary calculation of the guidelines range. And it's unsurprising that a terrorism-related contempt conviction would draw a higher sentence than Trudeau's. Trudeau's effort to minimize his culpability by reference to the small losses suffered by each book buyer requires no comment.

Based on the size of Trudeau's fraud and the flagrant and repetitive nature of his contumacious conduct, the ten-year sentence—about half the bottom of the guidelines range—was not unreasonable.

AFFIRMED.